**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY A. ADAMS, DENISE ADAMS,** | ) | |
| **SHAQUEL ADAMS RILEY, TAILON** | ) | |
| **ADAMS, GARY A. ADAMS, on behalf** | ) | |
| **of BRYA ADAMS, a minor, and** | ) | |
| **SHAQUEL ADAMS RILEY on behalf** | ) | |
| **of her minor children, SAVON RILEY,** | ) | |
| **SHANE ADAMS, SURRON ADAMS,** | ) | |
| **STEFON ADAMS, TERREL** | ) | |
| **JACKSON and SERENITY WEST,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 11-790** |
| | ) | **Judge Nora Barry Fischer** |
| **KAREN SPRINGMEYER, MICHAEL** | ) | |
| **O'MAHONEY, CHRISTIAN SCIULLI** | ) | |
| **and MICHAEL CHRISTMAN, in their** | ) | |
| **individual capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

### I. Introduction

The instant action involves allegations that law enforcement officials unlawfully entered a residence to execute two arrest warrants without taking reasonable steps to ensure that the individuals named in those warrants were residing and present within the home. Pending before the Court is a motion for summary judgment filed by the Defendants pursuant to Federal Rule of Civil Procedure 56. (Docket No. 89). For the reasons that follow, that motion will be granted in part and denied in part.

### II. Background

During the period of time relevant to this case, the Manchester OG street gang was engaging in criminal activities throughout the North Side of Pittsburgh, Pennsylvania. (Docket

Nos. 91 & 98 at ¶¶ 23-24). The group funded its criminal organization by distributing heroin and committing robberies. (*Id.* at ¶ 24). In 2008, the Federal Bureau of Investigation ("FBI") and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") started to investigate the gang. (*Id.* at ¶ 23). The investigations commenced by the FBI and the ATF were combined in 2009. (*Id.* at ¶ 25). Local law enforcement officials participated in the investigation as Task Force Officers. (*Id.* at ¶ 26). Electronic surveillance was utilized as a tool to accomplish the goals of the investigation. (*Id.* at ¶ 27).

Sondra Hunter ("Hunter") was married to James Reason ("Reason"). (Docket No. 92-15 at 2). The couple rented a residence located at 450 Orchard Avenue in Bellevue, Pennsylvania, while the criminal investigation was underway. (*Id.*). On July 8, 2009, Post Office Box 100271 was opened in Hunter's name in order to facilitate her receipt of correspondence related to an application for unemployment compensation benefits. (Docket No. 92-23 at 2, 7-8). In her online application requesting the opening of a Post Office box, Hunter listed the Orchard Avenue residence as her home. (*Id.* at 5). She also listed Reason as an individual who would be receiving mail from the Post Office box. (*Id.*).

Hunter and Reason moved out of the Orchard Avenue residence in May 2010. (*Id.*). In June 2010, eleven members of the Adams family moved into the residence. (Docket No. 100-1 at ¶ 2; Docket No. 100-2 at ¶ 2). The individuals living in the residence included Gary Adams ("Gary"), Denise Adams ("Denise"), their three children, and their six grandchildren. (*Id.*). The three children of Gary and Denise living in the house were Shaquel Adams Riley ("Shaquel"), Tailon Adams ("Tailon"), and Brya Adams ("Brya"). (*Id.*). Shaquel's six children, who also lived at the residence, included Savon Riley ("Savon"), Shane Adams ("Shane"), Surron Adams ("Surron"), Stefon Adams ("Stefon"), Terrell Jackson ("Terrell"), and Serenity West

("Serenity"). (Docket No. 100-2 at ¶ 2). Shaquel and Robert Ryberg ("Ryberg"), the owner of the residence, executed a "residential lease agreement" on June 5, 2010. (Docket No. 92-21 at 2-6). Hunter and Reason eventually moved into a different house in Bellevue. (Docket No. 92-15 at 2).

Before moving into the Orchard Avenue residence, Shaquel submitted a change-of-address form to the United States Postal Service in order to ensure that her mail would be delivered to the correct address. (Docket No. 100-2 at ¶ 6). She also listed that address on the registration card for her vehicle. (*Id.* at ¶ 7). In addition, Shaquel became responsible for paying utility bills associated with the Orchard Avenue residence. (*Id.*).

On January 6, 2011, Keenan Black ("Black") was a passenger in a blue Dodge Durango operated by Hunter. (Docket Nos. 91 & 98 at ¶ 32). During the course of a traffic stop, it was discovered that Black was in possession of a concealed firearm. (Docket No. 92-11 at 9). After acknowledging that he did not have a permit to carry a concealed firearm, Black was placed under arrest. (*Id.*). The firearm had apparently been stolen from a resident of Ross Township four days earlier. (*Id.*). Marijuana and heroin were found in the pockets of Black's jacket. (*Id.*). Criminal charges were filed against Black for his carrying of a firearm without a license,[1] his receipt of stolen property,[2] and his possession of illegal drugs.[3] (*Id.* at 3-4). Black had a Delaware driver's license. (Docket Nos. 91 & 98 at ¶ 33). The registration card for the Dodge Durango indicated that Hunter was living in a residence located at 1228 West North Avenue in Pittsburgh. (Docket No. 100-9 at 2; Docket No. 100-10 at 2).

Through the use of electronic surveillance, investigating officials heard Hunter make reference to a drug supplier. (Docket Nos. 91 & 98 at ¶ 34). Black's presence in Hunter's

[1] 18 PA. CONS. STAT. § 6106(a)(1).
[2] 18 PA. CONS. STAT. § 3925(a).
[3] 35 PA. STAT. § 780-113(a)(16), (30), (31).

Dodge Durango immediately before his arrest led the officials to believe that he was her supplier. (*Id.*). Hunter communicated with her cousin, Deron Nixon ("Nixon"), on January 7, 2011. (*Id.* at ¶ 35). Investigators understood the conversation to have arranged a meeting in which Hunter would give Nixon ten bricks of heroin in exchange for $300.00, which would later be used to cover Black's bail. (Docket No. 92-25 at 3). During the conversation, Hunter stated that she would travel to the meeting on foot, since her Dodge Durango was "hot." (*Id.*). Hunter evidently facilitated Black's release from custody by paying his bail. (Docket No. 92-2 at 39).

In February 2011, investigating law enforcement officials conducted surveillance near the residences located on Orchard Avenue and West North Avenue. (Docket Nos. 91 & 98 at ¶ 44). During the course of the surveillance, Hunter was never identified as an individual entering or exiting either residence. (Docket No. 92-26; Docket No. 100-13 at 12-13). Task Force Officer Joshua Whaley ("Whaley") reported that he had observed Black leaving the Orchard Avenue residence at 9:05 A.M. on February 10, 2011. (Docket No. 92-26 at 3). Five days later, investigating officers saw three individuals exit a silver Cadillac and enter the Orchard Avenue residence. (*Id.* at 5). It was later determined that the vehicle had been registered in Shaquel's name. (*Id.* at 5-6). The officers further reported that three children believed to be between the ages of five and fourteen had entered and exited the residence numerous times. (*Id.*).

On February 15, 2011, a federal grand jury indicted twenty-nine individuals associated with the Manchester OG street gang for their roles in two drug-related conspiracies and related offenses involving the illegal possession of firearms and heroin. (Docket No. 92-22 at 2). Hunter and Black were among the indicted individuals. (*Id.*). Hunter was charged with conspiring to distribute heroin.[4] (Docket No. 92-28 at 2). Black was charged with possessing

---

[4] 21 U.S.C. §§ 841(a), 846.

(with intent to distribute) heroin,[5] possessing a firearm in furtherance of a drug trafficking crime,[6] and possessing a firearm despite having a prior felony conviction.[7] (*Id.* at 3). Warrants authorizing the arrest of each individual were issued the next day. (Docket Nos. 91 & 98 at ¶ 30).

The surveillance of the two residences continued. Although a "black female" fitting the "height and weight description of Hunter" was seen leaving the vicinity of the West North Avenue residence in a black sport utility vehicle ("SUV") on the morning of February 17, 2011, the investigating officers were not able to positively identify the female as Hunter. (Docket No. 92-26 at 13). When the SUV returned to the residence less than two hours later, the officers determined that neither of the two females exiting the vehicle was Hunter. (*Id.*). The next day, investigating officers observed a black male and a black female exit the Orchard Avenue residence and leave in the silver Cadillac registered in Shaquel's name. (*Id.* at 15). Hunter was never seen on that occasion. (*Id.*).

On February 19, 2011, detectives "circled the perimeter" of the residence located on Orchard Avenue in an attempt to locate the blue Dodge Durango known to be associated with Hunter. (Docket No. 92-26 at 16). They were unable to locate the vehicle. (*Id.*). In a written report prepared that same day, Detective Chuck Higgins ("Higgins") described information that a confidential informant had relayed to him during the previous summer. (*Id.* at 17-18). In the report, Higgins stated that the informant had accused Reason of having "his girl" drive him around in a blue Dodge Durango in order to deliver "bricks of heroin" procured from a source in Delaware. (*Id.* at 17). The informant had apparently explained that Reason was "sell[ing] the

---

[5] 21 U.S.C. § 841(a).
[6] 18 U.S.C. § 924(c).
[7] 18 U.S.C. § 922(g)(1).

bricks from his house at 450 Orchard Ave." (*Id.*). Higgins reported that he had seen Reason exit

a blue Dodge Durango and enter the residence during the summer of 2010. (*Id.* at 18).

Although Hunter was not seen at the Orchard Avenue residence on February 19, 2011,

Higgins observed a black male estimated to be between the ages of twelve and fourteen

removing a "pink bag" from the trunk of Shaquel's silver Cadillac and taking it into the home.

(Docket No. 92-26 at 18). Shortly thereafter, Higgins saw a black male driving a purple Honda

park on Orchard Avenue, enter the residence for two to three minutes, and leave the area in the

Honda. (*Id.*). After viewing the license plate on the Honda, Higgins determined that the vehicle

was registered in the name of James Jackson ("Jackson"), who was known to be a user and seller

of illegal drugs. (*Id.*). Subsequent investigations failed to confirm Hunter's presence at the

Orchard Avenue residence or the West North Avenue residence. (*Id.* at 19-24).

Kelly Heim ("Heim"), an Intelligence Research Specialist for the ATF, contacted the

United States Postal Inspection Service ("USPIS") to verify that the individual receiving mail

from Post Office Box 100271 was living in the Orchard Avenue residence. (Docket No. 92-23 at

8). In an email to Heim sent on the afternoon of February 22, 2011, Postal Inspector Thomas

Ninan ("Ninan") confirmed that Hunter had opened Post Office Box 100271 on July 8, 2009,

that the physical address listed on her application referred to the Orchard Avenue residence, and

that Reason was "also an authorized key holder." (*Id.* at 7). Ten minutes later, Ninan sent Heim

a follow-up message reading as follows:

> Since the box was opened so long ago, we have to do an address check to confirm
> she lives there. She may have moved since the box was opened. Unless the
> address corresponds with your research.

(*Id.*). In a responsive message to Ninan, Heim made the following observations:

I think we're good. That address has pinged for us as well. We have some surveillance and other sources that are coming back to that address too. When I got the unemployment address I just wanted to double check to make sure that we weren't possibly missing an address. But I think we're all set. Thank you!

(*Id.* at 6). On February 24, 2011, Heim's request for information was formalized in a written letter to Ninan. (*Id.* at 4). Later that day, Ninan emailed Heim a copy of Hunter's application for a Post Office box. (*Id.* at 2). The address listed on the application corresponded with the location of the Orchard Avenue residence. (*Id.* at 5). Heim forwarded the application and related information to FBI Special Agent Karen Springmeyer ("Springmeyer"). (*Id.* at 2; Docket Nos. 91 & 98 at ¶¶ 9-10). ATF Special Agent Brian Cicco ("Cicco") received a copy of Heim's message. (Docket No. 92-23 at 2).

Supervisory Special Agent Michael Christman ("Christman") worked for the FBI's Pittsburgh Division and oversaw the investigation into the activities of the Manchester OG street gang. (Docket Nos. 91 & 98 at ¶¶ 1, 4). Special Agent Michael O'Mahoney ("O'Mahoney") was the FBI's case agent for the investigation. (*Id.* at ¶¶ 6-7). Christman exercised supervisory authority over both Springmeyer and O'Mahoney. (*Id.* at ¶ 5). Task Force Officer Christian Sciulli ("Sciulli"), a member of the City of Pittsburgh Bureau of Police ("BOP"), was assigned to the ATF's Task Force in connection with the investigation. (*Id.* at 17-18, 21).

In an email to several FBI agents sent on February 25, 2011, Christman stated that a "takedown" of the indicted members of the Manchester OG street gang had been scheduled for 6:00 A.M. on March 3, 2011. (Docket No. 92-17 at 2). In a "note" appearing at the end of his message, Christman expressed a belief that Hunter and Black were living together. (*Id.* at 3). The "arrest teams" assigned to apprehend them were encouraged to "stage and work together." (*Id.*). Christman's message advised the agents that the individuals named in the arrest warrants

were "extremely mobile and dangerous." (*Id.* at 2). On March 2, 2011, Christman spoke with both O'Mahoney and Sciulli about the probable locations of Hunter and Black. (Docket No. 92-1 at 18-19). It was ultimately determined that the Orchard Avenue residence was the "primary address" for both individuals. (Docket No. 92-13 at 2).

The FBI's Pittsburgh Division developed an "operations plan" to simultaneously execute twenty-six arrest warrants and six search warrants[8] against members of the Manchester OG street gang on the morning of March 3, 2011. (Docket No. 92-22 at 2). The plan called for the arrests of Hunter and Black at the Orchard Avenue residence at 6:00 A.M. (*Id.* at 7, 10). Both individuals were deemed to be "armed and dangerous." (*Id.* at 8, 10). Sciulli contacted the BOP to see whether a Special Weapons and Tactics ("SWAT") team was available to execute the arrest warrants. (Docket Nos. 91 & 98 at ¶ 108). Since no SWAT team was available, the Special Emergency Response Team ("SERT") of the Pennsylvania State Police ("PSP") agreed to provide the requested assistance. (*Id.*). Captain William Young ("Young") was designated as the SERT's overall commander at the scene of the Orchard Avenue residence. (*Id.* at ¶ 110). Young met with members of both the SERT and a BOP SWAT team on March 2, 2011, to discuss the impending execution of the arrest warrants. (*Id.* at ¶¶ 111-112).

The officers on Young's SWAT team[9] attempted to execute the arrest warrants at 6:00 A.M. on the morning of March 3, 2011, in accordance with the operations plan. (Docket Nos. 91 & 98 at ¶¶ 121-155). After verbal commands for Hunter and Black to exit the Orchard Avenue residence appeared to have gone unheeded,[10] the officers forcibly entered the house with a

---

[8] The search warrants were not connected with the Orchard Avenue residence. (Docket No. 92-3 at 13).
[9] For the sake of convenience and clarity, the Court will collectively refer to the members of the SERT and the BOP SWAT team as the "SWAT team."
[10] Gary testified that someone using a speaker had demanded that Hunter exit the residence with her hands up. (Docket No. 100-14 at 5). According to Gary, a "SWAT truck" had been sitting "about ten houses up the street" at the time of the verbal command, leading him to believe that a different residence was being targeted. (*Id.*). He

battering ram and started to issue verbal commands. (*Id.* at ¶¶ 127-132). The eleven members of the Adams family residing in the home complied with the officers' verbal commands. (*Id.* at ¶ 133). The residents of the house were told to wait outside while the officers searched for Hunter and Black. (*Id.* at ¶ 134). At some point, it became apparent that Hunter and Black were not there. The residents were permitted to re-enter the house and sit down in their living room. (Docket No. 92-14 at 2).

Springmeyer and two other FBI agents entered the residence and spoke with members of the Adams family. (Docket No. 92-14 at 2; Docket No. 100-1 at ¶ 7). During a conversation with Springmeyer, Shaquel stated that Hunter had been "kicked out" of the residence in May 2010. (Docket No. 92-14 at 3). Shaquel further advised that Hunter had moved to California shortly before the raid. (*Id.*). When asked whether Hunter lived in the West North Avenue residence, Shaquel responded in the negative. (*Id.*). She explained that Hunter's grandmother was living in the West North Avenue residence. (*Id.*). During the conversation, Springmeyer learned that mail for Hunter and her daughter continued to be delivered to the Orchard Avenue residence. (*Id.*). The members of the Adams family were unable to identify Black in a picture displayed by Springmeyer. (*Id.*). The law enforcement officials left the scene at approximately 6:40 A.M. (*Id.* at 4).

Shaquel contacted Hunter's daughter, Kia,[11] and advised that FBI agents were looking for Hunter.[12] (Docket No. 92-8 at 5-6). Hunter telephoned Shaquel to learn more about the situation. (*Id.* at 6). Shaquel provided Hunter with Springmeyer's telephone number. (*Id.*).

---

stated that the officers attempting to execute the arrest warrants had started to break into his house "no more than ten seconds" after demanding Hunter's exit. (*Id.*).

[11] Kia's last name does not appear in the record. (Docket No. 92-8 at 6).

[12] Shaquel's message was evidently relayed to Kia by the daughter of Shaquel's hairdresser. (Docket No. 92-8 at 5-6).

After speaking with Hunter, Shaquel telephoned Springmeyer and told her to expect a call from Hunter. (*Id.*).

The members of the Adams family residing in the house on Orchard Avenue commenced this action against Springmeyer and eleven unnamed defendants on June 15, 2011, alleging violations of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. (Docket No. 1). In their complaint, the Plaintiffs alleged that Springmeyer had "identified herself as the supervising agent" and informed Gary that the police officers "had entered his home to execute an arrest warrant on Sondra Hunter." (*Id.* at ¶ 21). On November 30, 2011, Springmeyer moved for the dismissal of the Plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Docket No. 9). The Plaintiffs responded to Springmeyer's motion on January 10, 2012. (Docket No. 14). The Court construed the Plaintiffs' response to be a request for leave to file an amended complaint and granted that request. (Docket No. 15). The Plaintiffs filed their amended complaint on January 30, 2012. (Docket No. 18). On February 29, 2012, Springmeyer filed another motion to dismiss and raised the affirmative defense of qualified immunity. (Docket No. 21). The motion was denied in a memorandum opinion and order dated May 22, 2012. (Docket Nos. 31 & 32); *Adams v. Springmeyer*, Civil Action No. 11-790, 2012 WL 1865736, 2012 U.S. Dist. LEXIS 71136 (W.D.Pa. May 22, 2012).

A decision denying a defendant's qualified-immunity defense at the motion-to-dismiss stage constitutes a collateral order that can be immediately appealed under 28 U.S.C. § 1291. *Ashcroft v. Iqbal*, 556 U.S. 662, 672, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). On July 19, 2012, Springmeyer filed a notice of appeal in order to preserve her appellate rights. (Docket No. 38). Four days later, Springmeyer moved to stay this action in order to afford the Solicitor General an

opportunity to decide whether an immediate appeal was appropriate. (Docket No. 39). The Court denied Springmeyer's motion for a stay without prejudice on August 8, 2012. (Docket No. 44). It was noted that Springmeyer could renew her motion in the event that the Solicitor General decided to let her pursue the appeal. (*Id.* at 1).

The Plaintiffs were subsequently granted leave to amend their complaint in order to identify the unnamed defendants. (Docket No. 48 at 1). The second amended complaint was filed on March 1, 2013. (Docket No. 60). Springmeyer, Cicco, Christman, O'Mahoney and Sciulli were named as defendants. (*Id.* at ¶¶ 7-17). On December 16, 2013, the Defendants moved for summary judgment. (Docket No. 89). The parties articulated their respective positions during the course of an oral argument session conducted on March 20, 2014. (Docket No. 112). On March 24, 2014, the parties submitted a stipulation providing for the voluntary dismissal of Cicco as a defendant in this case pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). (Docket No. 113). The parties also stipulated to the dismissal of all claims arising under the Fifth Amendment.[13] (*Id.*). The Defendants' motion for summary judgment remains pending with respect to all other claims and will be resolved in this memorandum opinion. (Docket No. 89).

## III.    <u>Standard of Review</u>

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v.*

---

[13] Since the Plaintiffs' claims are "covered by" the Fourth Amendment, they cannot proceed under a distinct theory of "substantive due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 842-844, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

*Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV.    Jurisdiction and Venue

The Plaintiffs' claims all arise under the Constitution of the United States. (Docket No. 60 at ¶¶ 36-38). The Court has jurisdiction in this case pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b).

## V.    Discussion

The Plaintiffs allege that the Defendants committed violations of the Fourth Amendment to the United States Constitution, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST., AMEND. IV. The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government. *McDonald v. City of Chicago*, 561 U.S. ___, ___, 130 S.Ct. 3020, 3028, 177 L.Ed.2d 894 (2010). The United States Supreme Court has found the proscriptions contained within Fourth Amendment to be enforceable against the States by operation of the Fourteenth Amendment's Due Process Clause.[14] *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The claims brought against the Defendants in this case arise from actions allegedly taken under color of both federal and state law. (Docket No. 60 at ¶¶ 37-38). To the extent that the Defendants are alleged to have acted under color of federal law, the Plaintiffs' claims are asserted under *Bivens v. Six Unnamed Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). (*Id.* at ¶ 37). Insofar as the Defendants are alleged to have acted under color of state law, the claims arise under 42 U.S.C. § 1983. (*Id.* at ¶ 38). Constitutional rights incorporated within the Due Process Clause are "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Malloy v. Hogan*, 378 U.S. 1, 10, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Although this case involves claims under both *Bivens* and § 1983,

---

[14] At the time of its adoption, the Fourth Amendment "did not apply to the States at all." *Virginia v. Moore*, 553 U.S. 164, 176, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008).

the analysis of the disputed legal issues is the same under both causes of action. *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

### A. The Constitutionality of the Initial Entry

"[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. ___, ___, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013). At the "very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). The applicable constitutional text, which refers to "[t]he right of the people to be secure in their . . . *houses* . . . against unreasonable searches and seizures," draws a line at the entrance of a house that is both "firm" and "bright." *Kyllo v. United States*, 533 U.S. 27, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Searches and seizures conducted inside of a home are presumptively "unreasonable" when they are not authorized by a warrant. *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004).

"A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). In the absence of consent or exigent circumstances, however, police officers need a warrant in order to enter an individual's home for the purpose of making an arrest. *Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002)(*per curiam*). This warrant requirement operates as the Fourth Amendment's "principal protection against unnecessary intrusions into private dwellings." *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court declared that the Fourth Amendment

"prohibit[ed] the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Speaking through Justice Stevens, the Supreme Court went on to make the following observations about the type of warrant required to authorize an arrest inside of a suspect's home:

> [W]e note the State's suggestion that only a search warrant based on probable cause to believe the suspect is at home at a given time can adequately protect the privacy interests at stake, and since such a warrant requirement is manifestly impractical, there need be no warrant of any kind. We find this ingenious argument unpersuasive. It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

*Payton*, 445 U.S. at 602-603. Even when law enforcement authorities have probable cause to arrest an individual, the holding in *Payton* "protect[s] his [or her] home from entry in the absence of a magistrate's finding of probable cause." *Minnesota v. Olson*, 495 U.S. 91, 95, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Nonetheless, that finding relates to the justification for the *arrest* rather than to the basis for the *entry*. *Payton*, 445 U.S. at 602-603.

The rule established in *Payton* applies when police officers enter a suspect's own residence to execute an arrest warrant. In *Steagald v. United States*, 451 U.S. 204, 205-206, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the Supreme Court held that, in the absence of consent or exigent circumstances, arresting officers needed a *search* warrant in order to lawfully enter the residence of a third party for the purpose of executing an arrest warrant. The holding in *Steagald* was premised on the fact that a warrant generally authorizing the arrest of another individual "did absolutely nothing to protect [the third party's] privacy interest in being free from an

unreasonable invasion and search of his [or her] home." *Steagald*, 451 U.S. at 213. In a footnote, the Supreme Court stated as follows:

> Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home. This analysis, however, is plainly inapplicable when the police seek to use an arrest warrant as legal authority to enter the home of a third party to conduct a search. Such a warrant embodies no judicial determination whatsoever regarding the person whose home is to be searched. Because it does not authorize the police to deprive the third person of his liberty, it cannot embody any derivative authority to deprive this person of his interest in the privacy of his home. Such a deprivation must instead be based on an independent showing that a legitimate object of a search is located in the third party's home. We have consistently held, however, that such a determination is the province of the magistrate, and not that of the police officer.

*Id.* at 214, n. 7. The rules adopted in *Payton* and *Steagald* apply only when police officers attempt to execute an arrest warrant inside of a *home. United States v. Correa*, 653 F.3d 187, 192, n. 5 (3d Cir. 2011)(finding the reasoning employed in *Payton* and *Steagald* to be inapplicable in a case involving a warrantless entry into "the common areas of an apartment building").

Under *Payton*, law enforcement officers armed with an arrest warrant possess the "limited authority" to enter the suspect's residence in order to execute the warrant, provided that they have "reason to believe" that the suspect is inside of the residence at the time of their entry. *Payton*, 445 U.S. at 603. In *United States v. Agnew*, 407 F.3d 193, 196 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit read *Payton* to mean that police officers could enter the home of a suspect in order to execute an arrest warrant only if they had "probable cause" to believe that the suspect could be found within the residence. One year later, in *United States v. Veal*, 453 F.3d 164, 167, n. 3 (3d Cir. 2006), the Court of Appeals observed that *Payton* was not explicit as to whether courts should apply a "probable cause" or "reasonable belief"

standard to the question of whether the existence of an arrest warrant can justify a nonconsensual

entry into a residence. Because the "probable cause" standard was satisfied in that case, the

Court of Appeals had no occasion to consider whether "a possibly lower standard of reasonable

belief" was applicable. *Veal*, 453 F.3d at 167, n. 3.

The uncertainty concerning the proper application of *Payton* manifested itself in

decisions rendered after *Agnew* and *Veal*. In *United States v. Porter*, 281 Fed.Appx. 106, 109

(3d Cir. 2008)(unpublished), the Court of Appeals again applied *Payton*'s "reason to believe"

standard without deciding whether it could be satisfied by a showing of something less than

probable cause. Discussing the question in a footnote, the Court of Appeals explained:

> The Court in *Agnew* cited *Payton* as requiring a showing of probable cause before
> police may enter a dwelling in which a suspect is believed to be located. *Agnew*,
> 407 F.3d at 196. However, the express language of the Supreme Court in *Payton*
> was that there need only be "reason to believe" the suspect is within. *Payton*, 445
> U.S. at 603. Obviously, this Court cannot change what the Supreme Court said
> and the Court in *Agnew* gave no explanation for citing *Payton* as requiring
> probable cause. We believe the reference to *Payton* as requiring a showing of
> probable cause was an error. This Court in *United States v. Veal*, 453 F.3d 164,
> 167 n. 3 (2006), recognized this potential error but, having found that the probable
> cause standard was met in that case, declined to further address the issue.
> Because this Court concludes that when they entered the police had both reason to
> believe and probable cause to believe that Porter was within Apartment C, we
> need not comment further.

*Porter*, 281 Fed.Appx. at 109, n. 3. The Court of Appeals took a similar approach to the issue in

*Williams v. City of Philadelphia*, 454 Fed.Appx. 96, 98, n. 2 (3d Cir. 2011)(unpublished),

declining to decide whether evidence falling short of "probable cause" could justify an entry

under *Payton*.

The parties hotly contest the question of whether the entry into the Orchard Avenue

residence was legal in the absence of probable cause to believe that Hunter could be found

therein at the time of the raid. The Defendants argue that *Payton*'s "reason to believe" language

should be read to mirror the "reasonable suspicion" standard discussed in *United States v. Arvizu*, 534 U.S. 266, 273-274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). (Docket No. 108 at 2). The Plaintiffs rely on *United States v. King*, 604 F.3d 125 (3d Cir. 2010), for the proposition that the "probable cause" standard should be applied in this case. (Docket No. 111 at 3). Unfortunately, *King* provides little guidance as to this issue for two separate reasons. First, the sentence in *King* relied upon by the Plaintiffs directly contradicts the Supreme Court's decision in *Steagald*. Compare *King*, 604 F.3d at 137 ("Officers may enter a *third party's* residence to arrest the subject of an *arrest* warrant if they have probable cause to believe she is inside.")(emphasis added), with *Steagald*, 451 U.S. at 205-206 (holding that, in the absence of consent or exigent circumstances, a law enforcement officer must procure a *search* warrant before "search[ing] for the subject of an arrest warrant in the home of a third party"). Second, the decision in *King* was issued more than a year before the decision in *Williams*. In *Williams*, the Court of Appeals continued to express uncertainty as to how the relevant language in *Payton* should be understood. *Williams*, 454 Fed.Appx. at 98, n. 2. Consequently, the Court of Appeals' statement in *King* (like its earlier statement in *Agnew*) could reasonably be regarded as an unintentional linguistic error. *Porter*, 281 Fed.Appx. at 109, n. 3. As far as the Court can tell, the issue remains unresolved in the Third Circuit. *United States v. Hill*, 649 F.3d 258, 263 (4th Cir. 2011)(including the Third Circuit among a "set of circuits . . . tak[ing] no position as to the relationship between 'reasonable belief' and probable cause").

Despite the ambiguity in the case law, the Court is convinced that the "reason to believe" language in *Payton* is properly understood as a reflection of the "probable cause" standard. The rule announced in *Payton* was premised on a concession that probable cause had existed to believe that the two suspects involved in the pending cases had been within their respective

residences at the time of the challenged entries. *Payton*, 445 U.S. at 583 ("We also note that in neither case is it argued that the police lacked *probable cause* to believe that the suspect was at home when they entered.")(emphasis added). In a dissenting opinion, Justice White described the required "grounds to believe that the suspect [wa]s within the dwelling" being entered as "an extra increment of *probable cause*" needed to facilitate the execution of an arrest warrant inside of a suspect's home. *Id.* at 616, n. 13 (White, J., dissenting)(emphasis added). While limiting the scope of *Payton* in *Steagald*, the Supreme Court appeared to presuppose that the "probable cause" standard was applicable thereunder. *Steagald*, 451 U.S. at 211, n. 6 ("Initially, we assume without deciding that the information relayed to Agent Goodowens concerning the whereabouts of Ricky Lyons would have been sufficient to establish *probable cause* to believe that Lyons was at the house searched by the agents.")(emphasis added). Language appearing in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), similarly suggests that entry under *Payton* must be based on probable cause to believe that the suspect is inside of his or her residence. *Buie*, 494 U.S. at 332-333 ("Possessing an arrest warrant and *probable cause* to believe Buie was in his home, the officers were entitled to enter and to search anywhere in the house in which Buie might be found.")(emphasis added). Although the Supreme Court was not squarely addressing the question presented in this case, the references to the "probable cause" standard found in its decisions nevertheless provide significant insight into its interpretation of *Payton*. *Morrow v. Balaski*, 719 F.3d 160, 169-170 (3d Cir. 2013)(*en banc*).

It is highly unlikely that the language used by the Supreme Court in *Payton* was crafted to create "an entirely new standard without explanation or elaboration." *United States v. Hardin*, 539 F.3d 404, 416, n. 6 (6th Cir. 2008). The disagreement as to whether *Payton*'s "reason to believe" standard differs from the more familiar standard of "probable cause" has more to do

with "semantics than substance." *United States v. Barrera*, 464 F.3d 496, 501, n. 5 (5th Cir.

2006). Regardless of how it is characterized, the standard articulated in *Payton* "embodies the

same standard of reasonableness inherent in probable cause."[15] *United States v. Gorman*, 314

F.3d 1105, 1112 (9th Cir. 2002). This reality is illustrated by the fact that the United States Court

of Appeals for the Third Circuit has repeatedly found it unnecessary to decide whether a

difference exists between the two standards. *Williams*, 454 Fed.Appx. at 98, n. 2; *Porter*, 281

Fed.Appx. at 109, n. 3; *Veal*, 453 F.3d at 167, n. 3. The Court is not persuaded by the decisions

validating entries undertaken pursuant to evidentiary showings falling short of probable cause.

*United States v. Thomas*, 429 F.3d 282, 285-286 (D.C.Cir. 2005); *Valdez v. McPheters*, 172 F.3d

1220, 1227, n. 5 (10th Cir. 1999); *United States v. Route*, 104 F.3d 59, 62 (5th Cir. 1997); *United

States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995).

In order to lawfully authorize the arresting officers' entry into the Orchard Avenue

residence for the purpose of executing the warrant for Hunter's arrest, the Defendants needed

probable cause to believe that she was both "residing and present" within the home on the

morning of March 3, 2011. *Veal*, 453 F.3d at 167-168. The existence or absence of probable

cause generally turns on the totality of the circumstances.[16] *Illinois v. Gates*, 462 U.S. 213, 238-

239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause is a "fluid concept" that acquires its

"substantive content" from the particular context in which it is applied.[17] *Ornelas v. United

States*, 517 U.S. 690, 696-697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). In the present context,

the relevant question is whether the facts and circumstances within the knowledge of the

---

[15] Despite the labels and terms frequently used in this area of the law, courts presented with Fourth Amendment claims "must still slosh [their] way through the factbound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

[16] The totality of the circumstances must be examined in most Fourth Amendment contexts. *United States v. Price*, 558 F.3d 270, 278, n. 6 (3d Cir. 2009).

[17] Because the standard of probable cause "deals with probabilities and depends on the totality of the circumstances," it is "incapable of precise definition or quantification into percentages." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).

Defendants, when viewed in relation to the totality of the circumstances, were sufficient to warrant a person of reasonable prudence and caution to believe that Hunter was residing and present within the residence at the time of the raid. *Dumbra v. United States*, 268 U.S. 435, 439, 45 S.Ct. 546, 69 L.Ed. 1032 (1925). The constitutionality of the Defendants' conduct must be considered in light of the information that was available to them at the time of their actions. *Maryland v. Garrison*, 480 U.S. 79, 85, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987); *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994). The justification for the Defendants' actions must be considered pursuant to an objective standard, without regard to their subjective motivations. *Wren v. United States*, 517 U.S. 806, 813-815, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Because of its fact-specific nature, the existence or absence of probable cause is ordinarily a question of fact appropriate for resolution by a jury. *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997).

It is undisputed that Hunter and Reason moved out of the Orchard Avenue residence in May 2010. (Docket No. 92-15 at 2). Shaquel and Ryberg executed a "residential lease agreement" on June 5, 2010, thereby facilitating the Plaintiffs' move into the home. (Docket No. 92-21 at 2-6). Gary and Shaquel have both submitted affidavits stating that Hunter had never returned to the residence after moving out. (Docket No. 100-1 at ¶ 4; Docket No. 100-2 at ¶ 4). Surveillance of the home conducted in February 2011 failed to uncover direct evidence of Hunter's continued residency or presence. (Docket No. 92-26). Although Ninan confirmed that Hunter had lived in the Orchard Avenue residence as late as July 8, 2009, he advised Heim that an "address check" was needed to determine whether Hunter had moved subsequent to that date. (Docket No. 92-23 at 6-8).

In an attempt to establish that they reasonably believed Hunter to be residing within the home at the time of the raid, the Defendants rely primarily on her association with Black. (Docket No. 108 at 3-4).  Whaley reported that he had observed Black exiting the Orchard Avenue residence at 9:05 A.M. on February 10, 2011.  (Docket No. 92-26 at 3).  Springmeyer, Christman, O'Mahoney and Sciulli all testified that Whaley's alleged observation of Black had been critical to their assessment that Hunter continued to live in the residence.  (Docket No. 92-1 at 18; Docket No. 92-2 at 17; Docket No. 92-3 at 18; Docket No. 92-6 at 18).  Gary and Shaquel both declared that Black had never been to the residence between June 2010 and March 2011. (Docket No. 100-1 at ¶ 4; Docket No. 100-2 at ¶ 4).  During a deposition, Whaley expressed confidence that he had seen Black (rather than someone else who looked like Black) leaving the residence on February 10, 2011.  (Docket No. 92-4 at 16).  Because the Defendants are the parties moving for summary judgment, the conflict in the testimonial evidence must be resolved in favor of the Plaintiffs at this stage.  *Toth v. California University of Pennsylvania*, 844 F.Supp.2d 611, 632 (W.D.Pa. 2012).  The analysis must proceed on the assumption that neither Hunter nor Black was actually seen entering or exiting the Orchard Avenue residence during the period of surveillance.

Although the accuracy of Whaley's identification of Black remains in dispute, the evidentiary conflict pertaining to that issue changes the "probable cause" calculus only if the Defendants had reasons to question the veracity of Whaley's report.  A law enforcement officer's assessment can be "reasonable" even if it is not "factually correct."  *Illinois v. Rodriguez*, 497 U.S. 177, 184, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)("If a magistrate, based upon seemingly reliable but factually inaccurate information, issues a warrant for the search of a house in which the sought-after felon is not present, has never been present, and was never likely to have been

present, the owner of that house suffers one of the inconveniences we all expose ourselves to as the cost of living in a safe society; he does not suffer a violation of the Fourth Amendment."). The surveillance report dated February 10, 2011, merely stated that Whaley had seen Black coming out of the Orchard Avenue residence at 9:05 A.M. (Docket No. 92-26 at 3). The report itself contained no indication that the person observed by Whaley may have been someone other than Black. (*Id.*). The Plaintiffs point to nothing in the record which suggests that the Defendants had reasons to believe that Whaley had misidentified the person seen leaving the residence. (Docket No. 97 at 9). Gary and Shaquel both declared that a "mug shot" of Black shown to them after the raid had been different from a photograph of Black previously provided to the PSP by the FBI. (Docket No. 100-1 at ¶ 9; Docket No. 100-2 at ¶ 8). The Plaintiffs insist that this perceived discrepancy "rais[es] the question of whether the mug shot used by Whaley was accurate." (Docket No. 97 at 9). The *accuracy* of the information relied upon by Whaley and the Defendants, however, is not what matters. The constitutionality of the Defendants' conduct must be judged in relation to the information known to them at the time of the actions alleged to have violated the Plaintiffs' constitutional rights. *Garrison*, 480 U.S. at 85. Actions taken on the basis of a "reasonable" misidentification do not violate the Fourth Amendment. *Hill v. California*, 401 U.S. 797, 802-804, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971). Therefore, Whaley's alleged observation of Black weighs in favor of the Defendants' position even though Black's presence at the residence remains in dispute. *Rodriguez*, 497 U.S. at 186 (remarking that the Constitution is not violated when police officers "enter [a residence] without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape").

On February 19, 2011, Higgins and his colleagues were unable to locate Hunter's blue Dodge Durango. (Docket No. 92-26 at 16). Nonetheless, Higgins reported that he had seen a black male quickly enter and exit the Orchard Avenue residence before leaving in a vehicle registered to Jackson, who was a known user and seller of illegal drugs. (*Id.* at 18). Higgins further stated that, during the summer of 2010, a confidential informant had told him that Reason was using the residence to sell bricks of heroin provided by a Delaware supplier. (*Id.* at 17). The written surveillance report went on to describe a perceived "drug transaction" involving the residence, Reason and the Dodge Durango that Higgins had observed shortly after speaking with the informant. (*Id.* at 18). In the report, Higgins noted that Hunter and Black had been riding together in the Dodge Durango at the time of Black's earlier arrest. (*Id.*).

The Defendants contend that Higgins' surveillance report, when combined with Whaley's identification of Black, provided them with a reasonable belief that Hunter was still living in the Orchard Avenue residence on March 3, 2011. (Docket No. 108 at 3-4). Contrary to this assertion, the report was *facially* questionable for two separate reasons. Higgins' observation of the vehicle registered to Jackson had no direct bearing on whether Hunter could be found in the residence. At most, that observation could have given rise to an inference that *someone* involved in the distribution of illegal drugs was living there. During her deposition, Springmeyer acknowledged that she had never been provided with information linking Hunter with Jackson. (Docket No. 100-11 at 17). Furthermore, the "drug transaction" alleged to have occurred during the summer of 2010 was too far removed from the February 2011 surveillance to constitute evidence of Hunter's *continued* residence in the home. In his February 25, 2011, email to the FBI agents preparing to execute the arrest warrants, Christman warned that the subjects of those warrants were "extremely mobile." (Docket No. 92-17 at 2). It is difficult to fathom how an

individual described in that manner could be expected to remain in one place for months at a time.

When probable cause exists, a law enforcement officer may act without undertaking an exhaustive investigation to validate his or her understanding of the relevant factual circumstances.[18] *Merkle v. Upper Dublin School District*, 211 F.3d 782, 790, n. 8 (3d Cir. 2000). If an intervening investigation is conducted, however, actions that might have been warranted at an earlier time may no longer be justified in light of subsequently-acquired information. *Prado Navarette v. California*, 572 U.S. ___, ___, ___ S.Ct. ___, ___ L.Ed.2d ___, 2014 WL 1577513, at *7, 2014 U.S. LEXIS 2930, at *18 (2014)(remarking that "[e]xtended observation of an allegedly drunk driver might eventually dispel a reasonable suspicion of intoxication"). During the course of their surveillance of the home on Orchard Avenue, the investigating officers saw some of the Plaintiffs "enter and exit the residence numerous times." (Docket No. 92-26 at 5). The investigators also saw the silver Cadillac and determined that it was registered to Shaquel. (*Id.*). Springmeyer testified that, prior to the raid, she had never received information suggesting that a relationship existed between Shaquel and Hunter. (Docket No. 100-11 at 18). The fact that others lived in the home did not necessarily mean that Hunter no longer resided there. *Los Angeles County v. Rettele*, 550 U.S. 609, 613, 127 S.Ct. 1989, 167 L.Ed.2d 974 (2007)(*per curiam*). Nevertheless, the presence of seemingly unrelated individuals, when coupled with the apparent *absence* of Hunter during the period of surveillance, should have caused the Defendants to question whether her living arrangements had changed. That is especially true in light of the fact that Hunter's blue Dodge Durango was registered to the address of the West North Avenue residence. (Docket No. 100-9 at 2; Docket No. 100-10 at 2).

---

[18] If the Defendants had probable cause to believe that Hunter was residing and present within the Orchard Avenue residence on March 3, 2011, "the likely result of any additional investigation that could have been conducted is irrelevant." *Dintino v. Echols*, 243 F.Supp.2d 255, 264 (E.D.Pa. 2003).

Even if Hunter had still lived in the Orchard Avenue residence, an entry to execute the arrest warrant would have been constitutionally permissible only if the Defendants had probable cause to believe that she was physically present *at the time of entry*. *Veal*, 453 F.3d at 167. "The fact that an individual is known to live at a particular location is one sound reason to expect him or her to be there." *United States v. Werra*, 638 F.3d 326, 340 (1st Cir. 2011). Under appropriate circumstances, arresting officers may reasonably infer that the subject of an arrest warrant (like any other individual) will most likely be home early in the morning. *Tyson v. Willauer*, 289 F.Supp.2d 190, 197 (D.Conn. 2003). Since Hunter was known to be "extremely mobile," however, the Defendants arguably needed more information about her daily routine in order to have probable cause to believe that she would be found in the residence at the time of the raid. *Commonwealth v. Gentile*, 2 N.E.3d 873, 879-880 (Mass. 2014).

As discussed earlier, the existence or absence of probable cause generally presents a question of fact for the jury. *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998). A court can conclude that probable cause existed as a matter of law only if the evidence, when viewed in the light most favorable to the nonmoving party, would not support a finding to the contrary. *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003). Given that the Defendants were aware of information that significantly undermined their belief that Hunter continued to reside on Orchard Avenue, the Court cannot conclude as a matter of law that the entry into the residence conformed to the requirements of the Fourth Amendment.

**B.      The Claims Arising From Springmeyer's Subsequent Entry**

The record indicates that the Plaintiffs were ordered to leave the Orchard Avenue residence during the course of the raid. (Docket No. 92-14 at 2). In a written report describing the event, Springmeyer stated that she and two other FBI agents had entered the home "to

confirm the presence of Hunter and/or Black" while members of the SWAT team were "exiting the residence." (*Id.*)(capitalization omitted). Young testified that, in a typical case, members of the SWAT team would have informed the FBI agents as to whether the subjects of the arrest warrants were present before inviting the agents to enter the home. (Docket No. 100-17 at 23-24). He could not remember whether such a notification had been conveyed to the FBI agents in this particular case. (*Id.*). Springmeyer testified that she had realized that neither Hunter nor Black was present after entering the living room of the Orchard Avenue residence and seeing the Plaintiffs at close range. (Docket No. 92-3 at 36). Although Springmeyer was unable to remember any specific conversations about whether Hunter and Black were there, she acknowledged that several members of the SWAT team had already left the residence at the time of her entry. (*Id.* at 37). Supervisory Special Agent Scott D. Argiro ("Argiro") is one of the agents who entered the residence with Springmeyer. (Docket No. 92-14 at 2). In a declaration submitted in support of the Defendants' motion for summary judgment, Argiro stated that he had "approached the residence to determine whether Sondra Hunter and Keenan Black were inside" "[a]fter the SWAT team [had] made entry and cleared the residence." (Docket No. 110 at 23, ¶ 5). Argiro further declared that, prior to his entry, he had not known whether Hunter or Black had been apprehended. (*Id.* at 23, ¶ 6).

In his affidavit, Gary declared that the FBI agents had entered the Orchard Avenue residence without the Plaintiffs' consent after the SWAT team's departure. (Docket No. 100-1 at ¶ 7). He identified Springmeyer as one of the agents who had entered the home. (*Id.*). During her deposition, Shaquel indicated that some members of the SWAT team had still been inside of the residence at the time of Springmeyer's entry. (Docket No. 92-8 at 3). Shaquel further testified that Springmeyer had entered the residence and stated, "We're looking for Sondra

Hunter." (*Id.*). Springmeyer evidently showed Shaquel photographs of both Hunter and Black. (*Id.*). Although Shaquel recognized Hunter, she denied knowing Black. (*Id.*). The ensuing conversation eventually led Shaquel to contact Kia and get Hunter in touch with Springmeyer. (*Id.* at 5-6). Shaquel testified that her conversation with the FBI agents had been "friendly." (*Id.* at 8). She denied that the agents had been "mean" throughout the encounter. (*Id.* at 9). Springmeyer testified that the Plaintiffs had been free to leave the residence at the time of her entry, and that none of them had been detained.[19] (Docket No. 110 at 25).

### 1. The Unreasonable "Search" Claims

The Plaintiffs allege that Springmeyer violated their Fourth Amendment rights by entering the Orchard Avenue residence after the absence of Hunter and Black had already been ascertained. (Docket No. 60 at ¶ 8). These Fourth Amendment claims are premised on the view that the "particular justification" for entry provided by the arrest warrants had already expired before Springmeyer's arrival. *Buie*, 494 U.S. at 332-333. The Defendants contend that Springmeyer's conduct was "objectively reasonable under the circumstances," and that summary judgment should be entered in her favor. (Docket No. 90 at 12).

In light of Young's testimony that members of the SWAT team would have normally informed the FBI agents of the presence or absence of the individuals named in the arrest warrants before facilitating the agents' entry into the residence, a reasonable trier of fact could conclude that Springmeyer was subjectively aware of the fact that Hunter and Black were not present when she went into the house. (Docket No. 100-17 at 23-24). Indeed, Springmeyer testified that several members of the SWAT team had already left the residence at the time of her entry. (Docket No. 92-3 at 37). Her written report stated that the purpose of the SWAT team's

---

[19] The written report of the encounter states that Springmeyer told Shaquel to have Ryberg contact the FBI in order to seek reimbursement for the damages caused by the SWAT team's entry into the residence. (Docket No. 92-14 at 3).

"protective sweep" of the residence had been to make sure that "no other parties were inside." (Docket No. 92-14 at 2). If the absence of Hunter and Black had already been confirmed, Springmeyer and her colleagues no longer had a "particular justification for entering" the residence. *Buie*, 494 U.S. at 332-333. *Payton* provides officers executing an arrest warrant with only the "limited authority" to enter a home for the purpose of effectuating the arrest. *Payton*, 445 U.S. at 603. In the absence of such continued authority or a search warrant, the FBI agents were free to enter the residence only if they had a distinct justification for doing so. *Olson*, 495 U.S. at 100.

Even in the absence of a warrant, law enforcement officers may constitutionally search a home with the consent of the owner. *United States v. Matlock*, 415 U.S. 164, 165-166, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Since "[t]he owner of a home has a right to allow others to enter and examine the premises," he or she remains free to "extend this same privilege to police officers." *Fernandez v. California*, 571 U.S. ___, ___, 134 S.Ct. 1126, 1132, 188 L.Ed.2d 25 (2014). The existence or absence of consent presents a question of fact requiring consideration of the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). At this stage, the Court must credit Gary's assertion that Springmeyer and her colleagues entered the Orchard Avenue residence *without* the Plaintiffs' consent. (Docket No. 100-1 at ¶ 7). Despite the "friendly" nature of Shaquel's conversation with the FBI agents, the Court cannot conclude as a matter of law that the agents had the Plaintiffs' consent to enter the residence. (Docket No. 92-8 at 8-9).

Government officials may enter a home without a warrant when "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless [entry] is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-

394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), quoting *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948). The Supreme Court "has identified several exigencies that may justify a warrantless search of a home." *Kentucky v. King*, 563 U.S. ___, ___, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011). "[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). Since a warrantless arrest may be constitutionally effectuated in a public place, officers in "hot pursuit" of a fleeing suspect need not abandon the chase merely because the suspect leaves a public place and enters his or her home. *United States v. Santana*, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). In addition, a warrantless entry may be justified by "a fairly perceived need to act on the spot to preserve evidence." *Georgia v. Randolph*, 547 U.S. 103, 116, n. 6, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). In this case, Springmeyer and her colleagues went into the Orchard Avenue residence after the home had already been "cleared" and the Plaintiffs were "back inside." (Docket No. 92-14 at 2). At least at this stage, the Court does not understand the Defendants to argue that the FBI agents' entry was justified by exigent circumstances.

In *Cady v. Dombroski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), the Supreme Court recognized that warrantless searches and seizures may sometimes be justified when police officers perform "community caretaking functions" that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady* involved a situation in which police officers had conducted a warrantless search of an automobile, which was "vulnerable to intrusion by vandals," for the sole purpose of preventing an unsecured gun possessed by an intoxicated driver from "fall[ing] into untrained or

perhaps malicious hands." *Cady*, 413 U.S. at 443, 448. Because the search had been undertaken solely to protect the public from harm, it was deemed to have been "reasonable" under the Fourth Amendment. *Id.* at 448.

Springmeyer testified that she and Argiro had entered the living room of the Orchard Avenue residence in order to make sure that the Plaintiffs did not need medical attention. (Docket No. 92-3 at 41). Entry for that purpose, however, was justified only if an objectively reasonable basis existed for believing that persons within the home were in need of immediate aid. *Michigan v. Fisher*, 558 U.S. 45, 47-49, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009)(*per curiam*). In *Ray v. Township of Warren*, 626 F.3d 170, 177 (3d Cir. 2010), the United States Court of Appeals for the Third Circuit held that the "community care doctrine" articulated in *Cady* did not authorize warrantless searches of a home. The Supreme Court has observed that since automobiles are "constantly movable," the circumstances permitting warrantless searches of automobiles do not always justify warrantless searches of homes. *Cooper v. California*, 386 U.S. 58, 59, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). In *Ray*, the Court of Appeals noted that the Supreme Court's decision in *Cady* had been "expressly based on the distinction between automobiles and homes for Fourth Amendment purposes." *Ray*, 626 F.3d at 177. Since Springmeyer entered the Plaintiffs' home, the "community care doctrine" does not warrant the entry of summary judgment in her favor. *Id.* It is also worth noting that, after entering the residence, Springmeyer attempted to procure information from the Plaintiffs about the locations of Hunter and Black. (Docket No. 92-8 at 3; Docket No. 92-14 at 2). Consequently, it cannot be said that the reasons for Springmeyer's entry were "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441.

## 2.     The Unreasonable "Seizure" Claims

The rule established in *Payton* was premised on the idea that "an arrest warrant founded on probable cause implicitly carrie[d] with it the limited authority to enter a dwelling in which the suspect live[d] when there [wa]s reason to believe [that] the suspect [wa]s within." *Payton*, 445 U.S. at 603.  In *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the Supreme Court relied on similar reasoning to hold that "a warrant to search for contraband founded on probable cause implicitly carrie[d] with it the limited authority to detain the occupants of the premises while a proper search [was being] conducted."  The rule adopted in *Summers* permits police officers executing a *search* warrant to detain the occupants of a residence for the purpose of "ensur[ing] their own safety and the efficacy of the search."  *Rettele*, 550 U.S. at 614.  It is not entirely clear whether *Summers* similarly authorizes police officers executing an *arrest* warrant to detain the occupants of the residence.  *Buie*, 494 U.S. at 334, n. 2 (remarking that "the existence of the arrest warrant implies nothing about whether dangerous third parties will be found in the arrestee's house").  The Supreme Court recently observed that because *Summers* "grants substantial authority to police officers to detain outside of the traditional rules of the Fourth Amendment," its reach must be carefully circumscribed.  *Bailey v. United States*, 568 U.S. ___, ___, 133 S.Ct. 1031, 1042, 185 L.Ed.2d 19 (2013).  Regardless of the type of warrant being executed, however, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."  *Summers*, 452 U.S. at 702-703.  For this reason, some federal courts have concluded that officers entering a residence to execute an arrest warrant may constitutionally detain the occupants of the residence for the period of time necessary to safely effectuate the arrest.  *Werra*, 638 F.3d at 330, n. 6; *Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003); *United States v.*

*Enslin*, 327 F.3d 788, 797, n. 32 (9th Cir. 2003). Given that police officers executing arrest

warrants frequently encounter the same dangers faced by those executing search warrants, the

Court is convinced that *Summers* extends far enough to authorize the temporary detention of

individuals residing within a house being entered under the authority of *Payton*.[20] *Wilson*, 526

U.S. at 611 (citing *Summers* for the proposition that police officers entering a home can take

certain actions that are not "explicitly authorized by the text of the warrant," provided that those

actions are "related to the objectives of the authorized intrusion").

"A person is 'seized' within the meaning of the Fourth Amendment when the government

terminates his or her freedom of movement through means intentionally applied." *Zion v.

Nassan*, 283 F.R.D. 247, 255 (W.D.Pa. 2012), citing *Brower v. County of Inyo*, 489 U.S. 593,

596-597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). Because the members of the SWAT team

who removed the Plaintiffs from their home are not defendants in this action, the Court has no

occasion to consider the legality of any seizures alleged to have preceded Springmeyer's entry

into the residence.[21] The Court assumes *arguendo* that, to the extent that the Plaintiffs were

detained by members of the SWAT team, those "seizures" were constitutionally permissible

under *Summers*. Accepting that premise, the Plaintiffs maintain that Springmeyer violated their

---

[20] Although the Plaintiffs do not base their Fourth Amendment claims on allegations that they were unlawfully detained *during* the SWAT team's search for Hunter and Black, they appear to question whether *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), authorizes officers executing an *arrest* warrant to detain the other occupants of a home within which the subject of the arrest warrant is believed to be residing and present. (Docket No. 97 at 13, n. 4).

[21] There are some inconsistencies in the record as to how the Plaintiffs were removed from the residence. In an incident report describing the raid, Springmeyer stated that the Plaintiffs had not been "handcuffed or restrained in any way." (Docket No. 92-14 at 2). Gary testified that an officer had handcuffed him after entering the residence. (Docket No. 100-14 at 6). Denise testified that an officer had offered to help her out of the residence, but that she had been fearful of getting a "severe cut" by walking on broken glass. (Docket No. 100-18 at 4). For Fourth Amendment purposes, the "reasonableness" of a search or seizure depends not only on whether it is justified, but also on the manner in which it is carried out. *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The second amended complaint could reasonably be construed to assert "excessive force" claims based on the manner in which the SWAT team attempted to execute the arrest warrants. (Docket No. 60 at ¶ 36). Claims of that kind arise under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394-395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). At this stage, however, the Plaintiffs are not pursuing any "excessive force" claims. (Docket No. 120 at 55-57).

Fourth Amendment rights by continuing to detain and interrogate them after it had become clear that Hunter and Black were not present.  (Docket No. 97 at 13-14).

In order to "seize" a person, a law enforcement officer must restrain that person's liberty by means of either "physical force" or a "show of authority."  *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).  "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."  *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).  "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification."  *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)(opinion of Stewart, J.).  A person is "seized" within the meaning of the Fourth Amendment only where "the officer's words and actions" would convey to an objectively reasonable person that his or her freedom of movement is being restricted.  *California v. Hodari D.*, 499 U.S. 621, 627-628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).  If a reasonable individual in that person's position "would feel free to terminate the encounter," he or she has not been "seized."  *United States v. Drayton*, 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002).  This objective standard "ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached."  *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).  The questioning of a detained individual does not constitute an "additional seizure" unless the individual's detention is "prolonged by the questioning."  *Muehler v. Mena*, 544 U.S. 93, 101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005).

To the extent that the Fourth Amendment claims asserted against Springmeyer are premised on a belief that she "seized" the Plaintiffs after entering the residence, Springmeyer is entitled to summary judgment. Shaquel testified that Springmeyer had immediately identified Hunter and Black as the targets of the raid after entering the home. (Docket No. 92-8 at 3). When asked about the ensuing conversation, Shaquel stated that the Plaintiffs' discussion with Springmeyer and Argiro had been "friendly." (*Id.* at 8-9). The record does not demonstrate that Springmeyer said anything that "would suggest to a reasonable person that he or she was barred from leaving the [home] or otherwise terminating the encounter." *Drayton*, 536 U.S. at 204. Given that the Plaintiffs were questioned inside of their own home, they may have felt a need to remain in the area "for reasons unrelated to the police presence." *Brendlin v. California*, 551 U.S. 249, 255, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). On the basis of the existing record, however, it cannot be said that "the circumstances of the encounter [we]re so intimidating" that a reasonable person would have believed that he or she "was not free to leave." *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). The claims premised on Springmeyer's entry into the residence remain viable only to the extent that they are based on allegations that she unreasonably "searched" the home after it had become apparent that Hunter and Black were not present. (Docket No. 60 at ¶ 8).

C.     **The Claims Brought Under 42 U.S.C. § 1983**

In addition to their claims under *Bivens*, the Plaintiffs bring claims under 42 U.S.C. § 1983, which provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws" of the United States. This statutory provision does not create substantive rights. *Maher v. Gagne*, 448 U.S. 122, 129, n. 11, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). A plaintiff pursuing a claim under § 1983 must allege an underlying violation of a federal constitutional or statutory right. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119-120, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005). Pursuant to 42 U.S.C. § 1988(b), a party prevailing in an action brought under § 1983 may be awarded "a reasonable attorney's fee as part of [his or her] costs."

In *Bivens*, the Supreme Court held that an individual aggrieved by a Fourth Amendment violation perpetrated by a federal official could recover money damages for injuries caused by that violation. *Bivens*, 403 U.S. at 397. In the specific Fourth Amendment context governed by *Bivens*, "the Constitution itself supports a private cause of action for damages against a federal official."[22] *Bush v. Lucas*, 462 U.S. 367, 374, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). The cause of action recognized in *Bivens* was derived from the general jurisdiction of the federal courts to adjudicate cases arising under the Constitution, statutes and treaties of the United States. *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 66-67, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). The constitutional remedy available under *Bivens* to individuals aggrieved by Fourth Amendment violations committed by federal officials is the "federal analog" to the statutory remedy available under § 1983 to individuals aggrieved by Fourth Amendment violations committed by state and local officials. *Hartman v. Moore*, 547 U.S. 250, 254, n. 2, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). Nonetheless, a party prevailing in an action brought

---

[22] This remedy is not available to every individual whose constitutional rights are violated by a federal official. *Wilkie v. Robbins*, 551 U.S. 537, 549-562, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007). The availability of the remedy depends on the precise nature of the constitutional violation at issue. *George v. Rehiel*, 738 F.3d 562, 585, n. 24 (3d Cir. 2013).

under *Bivens* cannot be awarded the "reasonable attorney's fee" available to a party prevailing in an action brought under § 1983. *Unus v. Kane*, 565 F.3d 103, 127 (4th Cir. 2009).

The first step in the Court's analysis is to "identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Every claim remaining in this case arises under the Fourth Amendment. (Docket No. 60 at ¶¶ 36-38). The Due Process Clause of the Fourteenth Amendment incorporates the provisions of the Fourth Amendment, thereby making them applicable to the States. *Thompson v. Wagner*, 631 F.Supp.2d 664, 672 (W.D.Pa. 2008). "State action sufficient to implicate the guarantees of the Fourteenth Amendment is likewise sufficient to satisfy § 1983's requirement of action taken 'under color of' state or local law."[23] *Brown v. Tucci*, 960 F.Supp.2d 544, 580 (W.D.Pa. 2013).

The claims brought by the Plaintiffs all stem from actions taken by the Defendants in connection with the execution of federal arrest warrants against Hunter and Black for alleged violations of federal law. (Docket No. 92-28 at 2-3). The Defendants contend that since they acted under color of *federal* law while facilitating the execution of the arrest warrants, they could not have acted under color of *state* law for purposes of § 1983. (Docket No. 90 at 17-18). The Plaintiffs maintain that their Fourth Amendment claims can proceed under § 1983 because the Defendants induced the PSP to utilize its resources to effectuate the allegedly unlawful entry into their home. (Docket No. 97 at 16-18).

An individual need not be "an officer of the State" in order to act under color of state law. *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). Private actors who "corruptly conspire" with state officials to deprive individuals of federal rights act under

---

[23] If a defendant's conduct constitutes "state action" for purposes of the Fourteenth Amendment, it necessarily satisfies § 1983's requirement of action taken under color of state law. *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 295, n. 2, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001).

color of state law within the meaning of § 1983.  *Dennis v. Sparks*, 449 U.S. 24, 27-29, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).  Liability under § 1983 extends to private parties involved in such conspiracies.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).  Since private individuals who conspire with state officials can be held liable under § 1983, the United States Court of Appeals for the Third Circuit has recognized that federal actors involved in similar conspiracies with state officials can likewise be held liable thereunder.[24] *Hindes v. Federal Deposit Insurance Corp.*, 137 F.3d 148, 158 (3d Cir. 1998).

A plaintiff attempting to hold a private individual liable under § 1983 for conspiring with state officials must ordinarily demonstrate that there was some form of "impropriety respecting the agreement" between that individual and the officials.  *NCAA v. Tarkanian*, 488 U.S. 179, 197, n. 17, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988).  Implicitly conceding that no such showing can be made in this case, the Plaintiffs argue that "the degree of coordination between the federal and state actors need not rise to the level of a 'conspiracy'" in order to constitute state action. (Docket No. 97 at 17).  The Plaintiffs maintain that their claims can proceed under § 1983 because "the federal defendants induced the PSP and its officers to use their authority as state law enforcement officers" to facilitate a forcible entry into the Orchard Avenue residence.  (*Id.* at 18).

The Supreme Court has articulated various grounds for finding certain individuals to be state actors even though they are not employed by the State.  *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001).  The theory that most closely resembles the position taken by the Plaintiffs is the one recognized in *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482

---

[24] *"Anyone* whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983."  *Filarsky v. Delia*, 566 U.S. ___, ___, 132 S.Ct. 1657, 1661, 182 L.Ed.2d 662 (2012)(emphasis added), quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

(1982). Under *Lugar*, the Plaintiffs must establish that the deprivation of constitutional rights alleged in their complaint "has resulted from the exercise of a right or privilege having its source in state authority," and that the Defendants "may be appropriately characterized as 'state actors'" under the facts of this case. *Lugar*, 457 U.S. at 939. In *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999), the Supreme Court made it clear that *both* of these showings must be made in order to justify a finding of state action.

When a private (or federal) actor exercises a right or privilege conferred by the State, he or she can sometimes become a state actor by "invoking the aid of state officials." *Wyatt v. Cole*, 504 U.S. 158, 162, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). In this case, however, the powers exercised by Springmeyer, Christman and O'Mahoney were not conferred on them by Pennsylvania law. *Georgia v. McCollum*, 505 U.S. 42, 51, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). It is undisputed that these three individuals were all federal agents exercising authority conferred on them by *federal* law. (Docket Nos. 91 & 98 at ¶¶ 1-12). Consequently, they obviously acted under color of federal law when they authorized the entry into the Plaintiffs' residence. *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 620-621, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). Given that Springmeyer, Christman and O'Mahoney were never "clothed with the authority of *state* law," they are not amenable to suit under § 1983. *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)(emphasis added), quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). The Defendants' motion for summary judgment will be granted with respect to the § 1983 claims asserted against Springmeyer, Christman and O'Mahoney.

During the relevant period of time, Sciulli was employed by the BOP. (Docket Nos. 91 & 98 at ¶ 17). In 2008, Sciulli was assigned to work for the ATF as a federally deputized Task Force Officer. (*Id.* at ¶ 18). Local law enforcement officials working in such a capacity are generally regarded as federal agents. *Colorado v. Nord*, 377 F.Supp.2d 945, 949 (D.Colo. 2005). Since it is undisputed that Sciulli was attempting to execute federal arrest warrants in his capacity as a federal Task Force Officer, the Defendants' motion for summary judgment will be granted with respect to the § 1983 claims brought against him. *Bordeaux v. Lynch*, 958 F.Supp. 77, 83-84 (N.D.N.Y. 1997); *Pou v. U.S. Drug Enforcement Administration*, 923 F.Supp. 573, 579 (S.D.N.Y. 1996); *Amoakohene v. Bobko*, 792 F.Supp. 605, 608 (N.D.Ill. 1992).

### D.     Qualified Immunity

Although § 1983 does not expressly refer to the immunities available to governmental officials at common law, it has generally been construed to be "in harmony with general principles of tort immunities rather than in derogation of them." *Imbler v. Pachtman*, 424 U.S. 409, 418, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). "For this reason, the 'qualified immunity' that was available to executive officials at common law may be invoked by executive officials sued under § 1983." *Ickes v. Borough of Bedford*, 807 F.Supp.2d 306, 317-318 (W.D.Pa. 2011), citing *Hafer v. Melo*, 502 U.S. 21, 28-29, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). In *Butz v. Economou*, 438 U.S. 478, 504, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court declined "to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Accordingly, federal defendants sued under *Bivens* may invoke the same immunity defenses available to state officials sued under § 1983. *Davis v. Scherer*, 468 U.S. 183, 194, n. 12, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

Executive officials performing discretionary duties are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerld*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A federal right is "clearly established" for purposes of qualified immunity if its contours are "sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Qualified immunity is not merely a defense to liability, but also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In order to effectuate that entitlement, the Supreme Court has frequently "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)(*per curiam*). A defendant's entitlement to qualified immunity on the basis of undisputed historical facts presents a question of law for the Court. *Curley v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007). When a defendant's entitlement to qualified immunity "depends on disputed issues of fact, those issues must be determined by the jury." *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006).

The Defendants raise the defense of qualified immunity in this action. (Docket No. 108 at 9-11). In an attempt to overcome that defense, the Plaintiffs advance a two-step argument. First, they contend that *Agnew*, *Veal* and *King* clearly established that law enforcement officers executing an arrest warrant needed "probable cause" to believe that the suspect was residing and present within a particular home in order to enter it without a search warrant. (Docket No. 97 at 20; Docket No. 118 at 1-4). Second, the Plaintiffs maintain that because a genuine issue of material fact exists as to whether "probable cause" was present in this case, the analysis

employed in *Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 191 (3d Cir. 1989), requires that the Defendants' motion for summary judgment be denied.  (Docket No. 111 at 3-4).

Although the Court agrees with the Plaintiffs' view that the standard of "probable cause" governs the reasonableness of an entry under *Payton*, the decisions of the United States Court of Appeals for the Third Circuit relied upon by the Plaintiffs do not clearly establish that rule of law.  In *Veal*, the Court of Appeals expressly stated that it was unnecessary to consider "whether a possibly lower standard of reasonable belief" should have been applied, since the standard of "probable cause" had been satisfied in any event.  *Veal*, 453 F.3d at 167, n. 3.  That observation would have been unnecessary if the issue had already been resolved in *Agnew*.  As noted earlier, the statement in *King* relied upon by the Plaintiffs cannot be regarded as authoritative because it contradicts the Supreme Court's holding in *Steagald*.  *King*, 604 F.3d at 137.  Nine months *after* the raid at issue in this case, the Court of Appeals continued to question whether *Payton* had established a threshold lower than "probable cause" to justify an entry into the residence of an individual named in an arrest warrant.  *Williams*, 454 Fed.Appx. at 98, n. 2.  If the applicable standard was unclear to members of the Court of Appeals *after* the raid, there is no way that it could have been clear to the Defendants at the time of the raid.

In *Deary*, the Court of Appeals concluded that defendants sued under § 1983 could not establish their entitlement to qualified immunity as long as genuine issues of material fact existed as to whether their actions had been supported by probable cause.  *Deary*, 746 F.2d at 188-193.  To the extent that *Deary* held that a defendant could never establish his or her entitlement to qualified immunity as a matter of law in the face of such a factual dispute, it is no longer good law.  In *Karnes v. Skrutski*, 62 F.3d 485, 491, n. 3 (3d Cir. 1995), the Court of Appeals recognized that *Deary* had been "supplanted by the Supreme Court's subsequent determination

of the question" in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In *Anderson*, the Supreme Court clarified that a law enforcement officer may be entitled to qualified immunity if he or she "reasonably but mistakenly conclude[s] that probable cause is present" and proceeds to conduct a search proscribed by the Fourth Amendment. *Anderson*, 483 U.S. at 638. Speaking through Justice Scalia, the Supreme Court emphatically rejected the idea that "no immunity [c]ould be provided to police officers who conduct[ed] unlawful searches of innocent third parties' homes in search of fugitives." *Id.* at 644.

Given the holding in *Anderson*, the Court cannot "leav[e] the whole matter to the jury" simply because a finding that probable cause was lacking could potentially be made on the basis of the evidentiary record. *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Plaintiffs cannot overcome the defense of qualified immunity by the simple expedient of "defin[ing] clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011). A defendant responsible for perpetrating a Fourth Amendment violation is entitled to summary judgment "before trial" if an objectively reasonable official in his or her position would not have known the challenged conduct to be unlawful.[25] *Hunter*, 502 U.S. at 227-228. Indeed, a court can sometimes conclude that a defendant is entitled to qualified immunity without determining whether an underlying constitutional or statutory right of the plaintiff has been violated. *Pearson v. Callahan*, 555 U.S. 223, 236-243, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Under the present circumstances, however, the foregoing principles do not require that summary judgment be entered against the Plaintiffs. Although the meaning of the phrase

---

[25] It is certainly possible for a defendant act *reasonably* in light of clearly established law even if his or her actions are deemed to be "unreasonable" within the meaning of the Fourth Amendment. *Safford Unified School District #1 v. Redding*, 557 U.S. 364, 377-379, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009). In the present context, the Defendants can be held personally liable only if their actions were *unreasonably* "unreasonable." *Anderson v. Creighton*, 483 U.S. 635, 643-644, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

"reason to believe" appearing in *Payton* has been the subject of disagreement among courts, the Defendants cannot establish their entitlement to qualified immunity simply by demonstrating that "courts ha[ve] not agreed on one verbal formulation of the controlling standard." *Saucier*, 533 U.S. at 202-203. The relevant question is whether the "state of the law" on March 3, 2011, gave the Defendants "fair warning that their conduct violated the Constitution." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Regardless of how the applicable standard has been articulated, courts have generally agreed that an entry is permissible under *Payton* only where multiple facts support a belief that the individual named in an arrest warrant is both residing and present within a particular home at the time of entry. *Hill*, 649 F.3d at 264; *Veal*, 453 F.3d at 168. Extensive surveillance of the Orchard Avenue residence conducted in February 2011 failed to yield a single observation of Hunter. (Docket No. 92-26 at 3, 5, 11, 15-20, 22-23). In his email to Heim, Ninan warned that an "address check" was needed to confirm that Hunter was still living in the Orchard Avenue residence. (Docket No. 92-23 at 7). The address check was never completed.[26] (Docket No. 92-27 at 2). On the basis of the existing record, the Court is not convinced that objectively reasonable officials in the situation faced by the Defendants would have concluded that they had "reason to believe" that Hunter was still residing and present within the home on the morning of March 3, 2011. *Payton*, 445 U.S. at 603.

The Defendants' decision to move forward with the raid appears to have been heavily influenced by Whaley's alleged observation of Black at the Orchard Avenue residence on February 10, 2011. (Docket No. 92-1 at 18; Docket No. 92-2 at 17; Docket No. 92-3 at 18;

---

[26] In an email to Jerry A. Kabala sent on March 7, 2011, Heim stated that the decision to "hold off" on the "address check" recommended by Ninan had been made during a conference call involving Sciulli and Assistant United States Attorney Craig Haller. (Docket No. 92-27 at 2). The email does not disclose the contents of the alleged conversation. Sciulli testified that he had no recollection of the conference call. (Docket No. 114 at 7). During the oral argument session conducted on March 20, 2014, the attorneys representing the Plaintiffs and the Defendants advanced arguments as to whether the record should be supplemented with evidence pertaining to the alleged discussion. (Docket No. 120 at 89-99). It was ultimately decided that supplemental evidence would not be submitted. (*Id.* at 98).

Docket No. 92-6 at 18). In his email of February 25, 2011, Christman expressed a belief that Hunter and Black were living together. (Docket No. 92-17 at 3). At the time of Black's earlier arrest, however, it became known that he was a resident of Delaware. (Docket Nos. 91 & 98 at ¶ 33). The Defendants apparently believed that Black was the Delaware supplier of heroin who had been mentioned in the investigative report prepared by Higgins. (Docket No. 92-26 at 17-18). This inconsistency in the Defendants' asserted beliefs about the location of Black's residence undermines their contention that they reasonably believed him to be *living* in the Plaintiffs' home. Reasonable officials in the position of the Defendants would have known that they needed a *search* warrant to "legally search for the subject of an arrest warrant in the home of a third party." *Steagald*, 451 U.S. at 205.

The entering officers sued in *Ray* were entitled to qualified immunity because, at the time of their actions, it had not been clear whether the "community caretaking doctrine" could justify a warrantless search of a home in the absence of consent or exigent circumstances. *Ray*, 626 F.3d at 177. *Ray* was decided more than three months before the raid conducted at the Orchard Avenue residence. The evidentiary record, when viewed in the light most favorable to the Plaintiffs, could support a finding that Springmeyer entered the Orchard Avenue residence *after* learning that Hunter and Black were not present. (Docket No. 92-7 at 32-33). The "limited authority to enter a dwelling" referenced in *Payton* permits an entry solely for the purpose of executing an arrest warrant. *Payton*, 445 U.S. at 603; *Buie*, 494 U.S. at 332-333. In his affidavit, Gary declared that Springmeyer had entered the Plaintiffs' home without their consent. (Docket No. 100-1 at ¶ 7). At the time of Springmeyer's entry, it was clearly established law that, in the absence of a warrant, a law enforcement officer could enter a home without the consent of the owners only in the face of exigent circumstances. *Ray*, 626 F.3d at 176-177.

Because the Defendants' entitlement to qualified immunity will turn on the existence of facts that have not yet been reduced to findings, the Defendants' motion for summary judgment will be denied with respect to the Fourth Amendment claims remaining in the case. The Defendants remain free to raise the defense of qualified immunity at trial. *Reedy v. Evanson*, 615 F.3d 197, 224, n. 38 (3d Cir. 2010). The Court expresses no opinion as to whether the Plaintiffs will ultimately be successful in establishing actionable violations of the Fourth Amendment.

### E. Punitive Damages

A plaintiff proceeding under *Bivens* can seek an award of punitive damages. *Hui v. Castaneda*, 559 U.S. 799, 805, 130 S.Ct. 1845, 176 L.Ed.2d 703 (2010); *Carlson v. Green*, 446 U.S. 14, 21-22, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Punitive damages are available "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). In order to be held liable for punitive damages under this standard, an official must act "in the face of a perceived risk that [his or her] actions will violate federal law." *Kolstad v. American Dental Association*, 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999).

The Plaintiffs' prayer for relief requests an award of punitive damages. (Docket No. 60 at 11). The Defendants argue that the record does not contain evidence suggesting that they subjectively disregarded a risk that facilitating a forced entry into the Orchard Avenue residence would violate the Plaintiffs' Fourth Amendment rights. (Docket No. 90 at 19). When the evidence is viewed in the light most favorable to the Plaintiffs, however, a reasonable jury could conclude that the Defendants acted with the requisite degree of recklessness by proceeding with

the raid in the absence of probative evidence indicating that Hunter would be found in the home. Although extensive surveillance of the residence failed to confirm Hunter's presence, the Defendants apparently opted to proceed with their operations plan in order to meet their *self-imposed* deadline for the simultaneous execution of the warrants authorizing the arrests of the indicted members of the Manchester OG street gang. (Docket No. 92-17 at 2-3). Under these circumstances, the question of whether punitive damages can be awarded in this case would be more appropriately resolved by a jury. *Smith*, 461 U.S. at 50-56. The Defendants' motion for summary judgment will be denied to the extent that it seeks a determination that the Plaintiffs are not entitled to an award of punitive damages.

**VI.**  **Conclusion**

The Defendants' motion for summary judgment will be granted with respect to all claims brought under § 1983 and the Fourth Amendment claims based on Springmeyer's alleged "detention" of the Plaintiffs after her entry into the Orchard Avenue residence. (Docket No. 89). The motion will be denied in all other respects. Since the Defendants acted solely under color of federal law, summary judgment will be entered against the Plaintiffs to the extent that their claims are brought under the Fourteenth Amendment. (Docket No. 60 at ¶ 37). The claims can proceed directly under the Fourth Amendment and *Bivens*.

By the Court:

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   May 5, 2014

cc/ecf:  All counsel of record